**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>DESIGNLINE CORPORATION, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 13-12089 (MFW)<br><br>Jointly Administered<br><br>**RE: D.I. 15** |

**OBJECTION OF CAMERON HARRIS TO DEBTORS' MOTION FOR (I) INTERIM
AND FINAL ORDERS AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(L), 364(C)(2),
364(C)(3), 364(D)(1) AND 364(E), AND (II) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

Cameron Harris ("Mr. Harris"), a creditor[2] in the above-captioned cases of DesignLine Corporation and DesignLine USA, LLC (together, the "Debtors"), through his undersigned counsel, respectfully submits this objection (the "Objection")[3] to the *Debtors' Motion for (i) Interim and Final Orders Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(1) and*

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal taxpayer identification numbers are DesignLine Corporation (3294) and DesignLine USA, LLC (3957). The Debtors' mailing address is 2309 Nevada Boulevard, Charlotte, NC 28273.

[2]    According to the Debtors' chapter 11 petitions, Mr. Harris' claim is not contingent, unliquidated or disputed.

[3]    By filing this Objection in this Court, Mr. Harris does not waive and expressly preserves all the arguments set out in the Motion to Transfer (defined below). Indeed, it is Mr. Harris' position that the Court should rule on the Motion to Transfer before considering the DIP Motion.

1

*364(e), and (ii) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [D.I. 15] (the "DIP Motion").[4]  In support of the Objection, Mr. Harris respectfully states as follows:

## PRELIMINARY STATEMENT

The Court should deny the DIP Motion, as the Debtors have failed to meet their burden of proof under section 364 of the Bankruptcy Code.  The DIP Facility fails to provide the Debtors' estates and the general unsecured creditors with any benefit whatsoever.  Indeed, the Debtors' CRO does not even attempt to argue that the DIP Facility is in the best interests of the Debtors' general unsecured creditors and the $15,000,000 of claims they hold.  *See generally* Goodman Decl.

Based on the way these cases were brought to the Court, it appears that after the insider Pre-Petition Lenders realized that they had run the Debtors out of options, the Pre-Petition Lenders devised these bankruptcy cases and the DIP Facility as a scheme to payoff control group liability and liquidate the Debtors' assets for their own benefit, while at the same time obtaining a broad release for all of their pre-petition conduct.  This Court should not condone the Pre-Petition Lenders' attempt to use this Court as a tool to cleanse themselves of this failed investment.  For these and the reasons stated below, the Court should deny the DIP Motion.

## FACTUAL BACKGROUND

1.       On August 15, 2013 (the "Petition Date"), DesignLine Corporation and DesignLine USA, LLC filed petitions (the "Petitions") for bankruptcy under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").

---

[4]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

2.        On the Petition Date the Debtors filed the *Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion") [D.I. 3].  On August 29, 2013 the Court approved the Joint Administration Motion.[5]

3.        On August 27, 2013 – 12 days after the Petition Date – the Debtors filed the DIP Motion.  The DIP Motion seeks the approval of a senior secured debtor in possession financial facility between the Cyrus Entities and the Debtors (the "DIP Facility").  A proposed interim DIP order was attached to the DIP Motion as Exhibit A (the "Proposed Interim Order").  According to the DIP Motion, the Cyrus Entities will lend the Debtors $375,000 if the Court approves the Proposed Interim Order and a further $2,625,000 if the Court approves the DIP Motion on a final basis.  In support of the DIP Motion, the Debtors filed the *Declaration of Katie Goodman in Support of Chapter 11 Petitions and First Day Motions* [D.I. 13] (the "Goodman Declaration").  Ms. Goodman is the Debtors' CRO.

4.        The Cyrus Entities are the lenders under the DIP Facility.  According to the DIP Motion, the Cyrus Entities consist of the following: Cyrus Opportunities Master Fund II, Ltd., Cyrus Select Opportunities Master Fund, Ltd., and Crescent 1, LP.  The DIP Motion also discloses that the following entities are the pre-petition lenders to the Debtors: Orix Venture Finance, LLC, Cyan PI Investments, LP, Cyan Partners, LP, GVP Growth Investments I, LP and the Cyrus Entities (collectively, the "Pre-Petition Lenders").

5.        The DIP Motion does **not** disclose that the Cyrus Entities hold at least 25.16% of the Debtors' equity.  *See* Chapter 11 Petition of DesignLine Corporation [D.I. 1].

6.        The DIP Motion does **not** disclose that Joseph J. Smith, the Debtors' CEO, is a consultant for Cyan, one of the Pre-Petition Lenders, and that Cyan was "the sole

---

[5]        The Court entered the Joint Administration Motion subject to the reservation of rights put on the record by counsel for Mr. Harris at the August 29, 2013 hearing.

arranger of DesignLine's November 2011 debt and equity capital raises", and that Joseph J. Smith, "in his capacity as a consultant to Cyan, [] also serves on the Company's Board of Directors." *See* DesignLine Corporation Announces Change of Leadership, March 14, 2012, http://www.designlinecorporation.com/index20.htm (last visited Sept. 3, 2013). According to the Petitions, Mr. Smith authorized the Debtors to filed for bankruptcy and enter into the DIP Facility. *See* Chapter 11 Petition of DesignLine Corporation [D.I. 1].

7.    On August 28, 2013, Mr. Harris filed the *Motion of Cameron Harris to Transfer Venue of These Cases to the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division* (the "Motion to Transfer") [D.I. 20].

## OBJECTION

**The DIP Motion is Subject to Heightened Scrutiny, and the Debtors' Have Failed to Meet that Standard**

8.    The Cyrus Entities are insiders under the Bankruptcy Code[6] and, therefore, the DIP Facility is subject to this Court's heightened scrutiny.[7] As insiders, the Cyrus Entities

---

[6]    The Cyrus Entities own 25.16% of the Debtors' equity and, therefore, as related entities, it is likely that they own directly or indirectly over 20% of the Debtors' equity and, therefore, are "affiliates" of the Debtors under the Bankruptcy Code. *See* 11 U.S.C. § 101(2). As affiliates, the Cyrus Entities are also "insiders" under the Bankruptcy Code. *See* 11 U.S.C. § 101(31)(E); *see, e.g.*, *In re All Land Investments, LLC*, 468 B.R. 676, 692 (Bankr. D. Del. 2012) ("These entities are 'affiliates' of the Debtor pursuant to Bankruptcy Code § 101(2)(B) and, therefore, insiders of the Debtor pursuant to § 101(31)(E)."). Furthermore, the amount of equity held by the Cyrus Entities may be even higher because the Debtors fail to disclose whether Cyrus Select Opportunities Master Fund, Ltd. holds any equity. In addition, considering the lack of information available regarding the Debtors and the Pre-Petition Lenders, Mr. Harris reserves all rights regarding whether the Pre-Petition Lenders are insiders under one of the other statutory definitions or are non-statutory insiders.

[7]    *See generally Schubert v. Lucent Techs. Inc. (in re Winstar Commc'ns., Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (quoting *Fabricators, Inc. v. Technical Fabricators (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991); *Estes v. N&D Props. (In re N&D Props., Inc.)*, 799 F.2d 726, 731 (11th Cir. 1986)

were in a position to control the Debtors, including their decision to file for bankruptcy and to enter into the DIP Facility. Indeed, through an analysis of the terms of the DIP Facility and the Debtors' admissions, it is clear that the Cyrus Entities exercised this control. This control manifested itself in the DIP Facility which, as demonstrated below, should be denied by this Court.

9.     To obtain approval of a DIP Facility, the Debtors must prove that: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) the financing is in the best interests of the estate and its creditors; (c) the transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the debtor's business; (d) the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor-borrower and proposed lender; and (e) the financing was negotiated in good faith and at arm's length by the debtor, on the one hand, and the lender, on the other hand. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003). The Debtors fail to meet this standard.

10.     The Debtors rely exclusively on the Goodman Declaration to support their entry into the DIP Facility, yet the Goodman Declaration conspicuously lacks critical information regarding how the DIP Facility benefits the Debtors' general unsecured creditors, the Debtors' efforts to obtain financing different from the DIP Facility, and the steps the Debtors took to ensure that the DIP Lenders did not dominate the negotiation of the DIP Facility. Given

---

(finding that an insider's claims may be equitably subordinated upon a showing of mere unfair conduct, whereas a non-insider's claim can only be equitably subordinated upon a showing of "more egregious conduct"); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (recognizing that the "'heightened scrutiny' standard . . . closely examines transactions involving insiders"); *Matter of NuGelt, Inc.*, 142 B.R. 661, 667 (Bankr. D. Del. 1992).

the heightened level of scrutiny applicable to the DIP Facility, the Debtors have failed to meet their burden and the Court should deny the approval of the DIP Facility.

11.      It is obvious from the DIP Facility that it is in the best interests of the Cyrus Entities and the Pre-Petition Lenders, but the Goodman Declaration fails to demonstrate how the DIP Facility is in the best interest of the Debtors' other creditors, which are owed in excess of $15,000,000.  *See* Goodman Decl., ¶ 15.  The Debtors are required to demonstrate that the Debtors' general unsecured creditors are better off with the DIP Facility than without.  *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y 1985) (finding that a court should approve a proposed debtor in possession financing only if such financing "is in the best interests of the general creditor body.") (internal citations omitted).  Despite this, the Goodman Declaration fails to establish how the Debtors' general unsecured creditors benefit from the DIP Facility.  Indeed, the DIP Facility raises the question of whether the Debtors' general unsecured creditors would be better off **without** the DIP Facility.  For example, why should the Debtors' general unsecured creditors bear the costs of the Debtors' and the Lenders' professionals, when a chapter 7 trustee can liquidate the assets of these non-operating companies for far less?  How do the Debtors' general unsecured creditors benefit from the D&O tail insurance policy the Debtors intend to purchase?  *See* Proposed Interim Order, ¶ 7(a).  How do the broad releases and stipulations for the benefit of the DIP Lenders in the Proposed Interim Order benefit the Debtors' general unsecured creditors?

12.      The Debtors also fail to demonstrate that alternatives to the DIP Facility do not exist.  In her declaration, Ms. Goodman states that "the Company has engaged in substantial efforts to attract new financing. These efforts included, but were not limited to, making requests of the existing prepetition lenders, identifying strategic partners, business

customers and vendors and other parties that might be motivated by a business purpose or combine with and support the Company." *See* Goodman Decl., ¶ 23.  Based on this, the Debtors failed to even **contact** lenders or investors other than the Pre-Petition Lenders.  And even if the Debtors did conduct some search for an alternative to the DIP Facility, given that the Debtors' CEO is affiliated with a Pre-Petition Lender and substantially all the Debtors' equity is held by the Pre-Petition Lenders, it does not appear that the Debtors could have conducted a disinterested search for an alternative to the DIP Facility.  Furthermore, Ms. Goodman, as CRO, could not have conducted an adequate search, as it appears that GGG Partners was only engaged around the end of July 2013.[8]

13.     Furthermore, based on the Goodman Declaration, the Debtors did not put any protections in place to ensure that the Pre-Petition Lenders did not dominate the negotiations of the DIP Facility.  As a result, the Court cannot approve the Debtors' requested good faith finding under section 364(e) of the Bankruptcy Code.[9]  *See* Proposed Interim Order, § 16(c).

14.     Mr. Harris submits that the Court's analysis should end here, as the Debtors have failed to demonstrate that the Court should approve the DIP Facility.  However, if the Court examines the rest of this flawed insider debtor in possession financing, there are a number of other serious issues with the DIP Facility that would not be appropriate in any arm's length debtor in possession financing arrangement, much less this insider transaction.

---

[8]     *See Initial Monthly Operating Report*, at Schedule of Retainers Paid to Professionals [D.I. 36].

[9]     Similarly, the Court should not approve any findings regarding whether the DIP Lenders are in control of the Debtors.  *See* Proposed Interim Order, ¶ 17(d).

**The Sale Milestones Imposed by the DIP Lenders are Inappropriate, as There is No Need to Immediately Liquidate these Mothballed Companies**

15.        The Court should extend each sale milestone contained in the DIP Credit Agreement by at least four weeks, as there is no reason why the Debtors must sell their assets as quickly as the DIP Lenders require. Under the DIP Credit Agreement, the Debtors must auction off their assets on October 17, 2013**.**  *See* DIP Credit Agreement, § 2.1.  Prior to that date, there are a number of equally accelerated milestones regarding the negotiation of a letter of intent, approval of bid procedures, and execution of APA, each of which seriously calls into question whether the Debtors are seeking the highest and best possible price for their assets.  Incredibly, there is no support in the Goodman Declaration for this accelerated sale timeframe.  Indeed, the facts of this case demonstrate that the Debtors are non-operating entities with hardly any expenses except for professional fees and rent.  Under these facts, there is simply no justification for the DIP Lenders' accelerated sale timeline.  Accordingly, the Court should extend each sale milestone contain in the DIP Credit Agreement by at least four weeks in order to ensure the Debtors' assets are properly marketed.

**Immediate Payment of Sale Proceeds is Inappropriate**

16.        The DIP Credit Agreement provides for the payment of sale proceeds to the Lenders within two days of receipt.  *See* DIP Credit Agreement, § 2.4(b)).  The DIP Credit Agreement also provides that the first $3,000,000 of proceeds from the Specified Vehicle Collateral must be paid to the Specified Vehicle Lien Lenders within two days of receipt.  *See id*. In light of the risk of administrative insolvency and the insider status of DIP Lenders and the

Pre-Petition Lenders, payment of any sale proceeds should be withheld pending confirmation of a chapter 11 plan for the Debtors.[10]

**As the DIP Facility is an Insider Transaction, the Committee and Parties-In-Interest Should Have an Unlimited Time Period to Investigate the DIP Lenders and Pre-Petition Lenders**

17.     The DIP Facility imposes overly restrictive terms on the investigation and potential pursuit of actions against the DIP Lenders and the Pre-Petition Lenders.  *See* Interim Order, ¶ 6. First, the Committee and parties-in-interest are not granted standing to commence and prosecute any Claims or Defenses, but rather must gain standing before filing an adversary proceeding.  *Id*.  As a further restriction, the Committee allotted only sixty days[11] from its appointment to both investigate **_and_** secure standing.  Even assuming the Committee or a party-in-interest obtains standing within the applicable timeframe, the Committee or party-in-interest only has 15 days to commence a Claim or Defense.  *Id*.

18.     Considering that the DIP Lenders and Pre-Petition Lenders are insider equity holders, the Challenge Period should only apply to the right of the Committee or a party-in-interest (including a chapter 7 trustee) to challenge the perfection of alleged liens of the DIP Lenders and Pre-Petition Lenders.  In *AFA Investments*, this Court ruled that the investigation period under the debtors' post-petition debtor in possession financing order should only apply to the perfection of a lender's liens when that lender also held equity in the debtor. *See AFA Investments*, Case No. 12-11127 (MFW) (Bankr. D. Del. April 24, 2012) Hr'g Tr. 29-30 [D.I. 194].  As the facts here are substantially similar to those in *AFA Investments*, the Court should

---

[10]     The immediate payment of sale proceeds is also suggestive of an impermissible *sub rosa* plan.  Mr. Harris reserves the right to object to any sale on these (and any other) grounds at the appropriate time.

[11]     The Proposed Interim Order provides that parties-in-interest only have 75 days from the entry of the Interim Order to gain standing.  *See* Proposed Interim Order, ¶ 6.

deny the DIP Lenders' attempt to inappropriately shield their alleged liens and claims from challenge.

19.       The Proposed Interim Order contains a $25,000 investigation budget for the Committee.  *See* Proposed Interim Order, ¶ 14.  This amount is wholly inadequate in light of the fact that the Debtors have disclosed so little about their operations, assets, and insider-dominated capital structure.  The Committee must perform a perfection analysis to determine whether the Pre-Petition Lenders have perfected liens in any of the Debtors' assets.  More importantly, the Committee also must investigate whether there exists any claims against the Pre-Petition Lenders or any objections or challenges to their alleged liens and claims.  Accordingly, the Court should not impose any cap of the Committee's investigation budget.  Mr. Harris, however, is not advocating for an unlimited professional fee budget, instead both the Debtors' professionals and the Committee's professionals should share the same budget line item. *See In re Evergreen Solar. Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. Sept. 1, 2011) [D.I. 115] (Court rejected the debtor's proposed caps, and substituted a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis).  The Pre-Petition Lenders are effectively using this Court to conduct a foreclosure; therefore, the Committee should not receive disparate treatment under the DIP Lenders' proposed professional fee budget.

**Waiver of Bankruptcy Code Section 506(c) Surcharge Rights Is Inappropriate**

20.       Under the DIP Facility, the Debtors waive the ability to surcharge the DIP Lenders and the Pre-Petition Lenders or any of the collateral allegedly held by the foregoing, as

permitted by section 506(c) of the Bankruptcy Code.  *See* Interim Order, ¶ 8.[12]  The effect of this

section 506(c) waiver is to eliminate a further avenue of recovery for the Debtors' estates and to

guarantee that the costs of the Debtors' liquidation will be borne by the unsecured creditors

alone.  Because waivers of surcharge rights contravene the intent behind section 506(c) of the

Bankruptcy Code, courts routinely reject such waivers.  *See In re Mortg. Lenders Network USA,*

*Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 20, 2007) Hr'g Tr. 21 [D.I. 346].  The

Court should likewise deny the DIP Lenders' request for a section 506(c) waiver.  Alternatively,

the Court should require the DIP Lenders to fund all administrative expenses of the Debtors'

cases.

**Waiver of the "Equities of the Case" Exception is Inappropriate**

21.    Under the DIP Facility, the Debtors waive the "equities of the case"

exception under section 552(b) of the Bankruptcy Code for the benefit of not only the DIP

Lenders, but also the Prepetition First Lien Lenders and the Special Vehicle Lien Lenders.  *See*

Interim Order, ¶ H.  Section 552(b) of the Bankruptcy Code would otherwise allow the Debtors,

the Committee or a party-in-interest to assert that equitable considerations warrant the exclusion

of post-petition proceeds from Prepetition First Lien Collateral and the First Priority Specified

Vehicle Lien Collateral.  The facts of these cases weigh heavily against granting the section

552(b) waiver.  These Chapter 11 Cases were commenced for the sole purpose of liquidating the

Debtors' assets for the exclusive benefit of the Debtors' insiders.  This is the backdrop against

which the Debtors ask this Court to make a finding of fact that the "equities of the case"

---

[12]    Mr. Harris understands that the Debtors propose this provision become effective upon entry of a final order approving the DIP Motion.  However, the DIP Lenders are still demanding the inclusion of this objectionable provision and, therefore, it is appropriately raised now to give the Court the full backdrop of this inappropriate debtor in possession financing facility.

exception contained in section 552(b) is prospectively waived – a finding that would be wholly inappropriate at this time. *See Metaldyne*, 2009 WL 2883045, at *6 (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact . . . and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make").

**The DIP Lenders Should Not Obtain a Lien in the Proceeds of the Debtors' Avoidance Actions**

22.      Through inclusion of proceeds of Avoidance Actions in the DIP Collateral, the Debtors propose to shift unencumbered value to the DIP Lenders in a manner that is inconsistent with both the intent behind the Avoidance Actions and the scope of a debtor in possession's avoidance powers. *See* Interim Order, ¶ 2(d)(I).[13]   It is well-established that the avoidance powers can only be exercised for the benefit of the estate.[14]  To restrict recoveries on account of Avoidance Actions to a few privileged creditors distorts the very purpose of providing the debtor in possession with avoidance powers in the first place.  Moreover, the Avoidance

---

[13]      Mr. Harris understands that the Debtors propose this provision become effective upon entry of a final order approving the DIP Motion.  However, the DIP Lenders are still demanding the inclusion of this objectionable provision and, therefore, it is appropriately raised now to give the Court the full backdrop of this inappropriate debtor in possession financing facility.

[14]      *See, e.g.*, *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."); *see also Mellon Bank (E.), N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D. N.J. 1987) (finding that only the trustee, acting on behalf of all the creditors, has a right to recover payments made as preferences); *Buncher Co. v. Official Comm. Of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."); *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . .").

Actions are not the Debtors' property, but rather rights that may be exercised for the benefit of the Debtors' creditors. *See Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-47 (3d Cir. 2000) (holding that state law fraudulent transfer claim is not an asset of the debtor).  As such, the Debtors do not possess the authority to grant a security interest in the proceeds of Avoidance Actions for the benefit of only a few of the Debtors' creditors.

## The $100,000 Work Fee Payable to the DIP Lenders Should Not Be Approved

23.    Considering that the entire DIP facility is only $3,000,000, it is wholly inappropriate for the Debtors to pay $100,000 to the DIP Lenders as an ambiguous "Work Fee," especially given the fact that the Debtors' chapter 11 cases are already being run for the benefit of the DIP Lenders and the Pre-Petition Lenders.   *See* DIP Credit Agreement, § 2.5. Furthermore, the Proposed Interim Order obligates the Debtors to pay the fees of the Lender Professionals.  *See Proposed Interim Order, ¶* 17(a).  However, the Debtors have not provided any budget for these expenses, therefore the Court cannot determine whether the payment of these fees is appropriate or whether the Debtors' obligations to pay such fees should be subject to a cap.  Accordingly, the Proposed Interim DIP Order should not require the Debtors pay for the fees of the Lender Professionals until the DIP Lenders provide a budget for such fees and the Court makes a determinate that the proposed budget is reasonable.

## Financial Statements

24.    The Credit Agreement provides that the Debtors will provide the Lenders any financial statements or other information requested by the Lenders within three business days of such request.  *See* Credit Agreement, § 5.1.  That information should be provided to the Committee and the members of the Committee simultaneously.

**The DIP Facility Contains Unnecessary and Inappropriate Events of Default**

         25.      The DIP Lenders should not be permitted to immediately exercise remedies upon occurrence of an Event of Default.  *See* Proposed Interim DIP Order, ¶ 13(a).  Instead, the DIP Lenders should be required to give five days' notice to the Debtor, Committee and the U.S. Trustee so that such parties can take appropriate action.  Furthermore, the DIP Lenders should not limit how this Court decides to conduct a hearing on whether an event of default exists under the DIP Facility.  *See* Proposed Interim Order, ¶ 13(a) ("Following the giving of an Enforcement Notice by the DIP Lenders and any Committee shall be entitled to an emergency hearing before this Court, at which the only issue shall be whether or not an Event of Default has occurred.")

         WHEREFORE, for the foregoing reasons, Mr. Harris respectfully requests that the Court (i) sustain this Objection; (ii) deny the DIP Motion; and (iii) grant such other and further relief as is just and proper.

Dated:  September 3, 2013         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       Wilmington, Delaware

                                 */s/ Andrew R. Remming*
                                 Robert J. Dehney (No. 3578)
                                 Gregory W. Werkheiser (No. 3553)
                                 Andrew R. Remming (No. 5120)
                                 1201 N. Market Street
                                 P.O. Box 1347
                                 Wilmington, DE  19899-1347
                                 Telephone:  (302) 658-9200
                                 Facsimile:  (302) 658-3989
                                 rdehney@mnat.com
                                 gwerkheiser@mnat.com
                                 aremming@mnat.com

                                 *Attorneys for Mr. Harris*